**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
|  | * |  |
| **JOHN AND JANE PARENTS 1,** *et al.,* | * |  |
| *Plaintiffs,* | * |  |
|  | * | **Case No. 8:20-3552-PWG** |
| **v.** |  |  |
|  | * |  |
| **MONTGOMERY COUNTY BOARD** **OF EDUCATION,** *et al.,* | * |  |
| *Defendants.* | * |  |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

In this action, three parents of Montgomery County Public School ("MCPS") students allege that MCPS's 2020–2021 Guidelines for Student Gender Identity in Montgomery County Public Schools (the "Guidelines") violate their state and federal constitutional rights as parents, as well as various state and federal statutes and regulations. ECF No. 7, Complaint. Pending before me is the Motion to Dismiss filed by Defendant Montgomery County Board of Education ("MCBE") and its members. ECF No. 32, Defendants' Motion to Dismiss ("Motion"). The Motion has been fully briefed,[1] and an Amicus Brief has been filed in support of MCBE's Motion.[2] I have reviewed the Parties' filings and find that no hearing is necessary. Local Rule 105.6 (D. Md. 2021).

---

[1] ECF No. 53, Plaintiffs' Opposition ("Opposition"), and ECF No.54, Defendants' Reply (Reply).

[2] ECF No. 46, Brief of Amici Curiae PFLAG Metro DC; Freestate Justice; The Center for LGBTQ Health Equity – Chase Brexton Health Care; MoCo Pride Center; Rainbow Youth Alliance; SMYAL; and Whitman-Walker, Inc. / DBA Whitman-Walker Health in Support of Defendants' Motion to Dismiss ("Amicus Brief").

For the reasons outlined in this Memorandum Opinion, the Defendants' Motion to Dismiss is GRANTED.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs in this matter, who have filed their claims anonymously, are the adult parents of minor children who presently attend high school in the Montgomery County Public School system ("Parents" or "Plaintiff Parents"). Compl. ¶¶ 3–4. All three Parents also have younger children, who they intend to enroll in MCPS "at some time during their elementary and secondary education." *Id*. The Parents filed this action against MCBE and its members in the Circuit Court for Montgomery County, Maryland, on October 20, 2020, and MCBE removed it to this Court. *Id.*; ECF No. 1, Notice of Removal.

The Parents allege in their Complaint that MCBE has adopted a "Policy," *i.e.*, the Guidelines, "expressly designed to circumvent parental involvement in a pivotal decision affecting" their children's "care, health education, and future." Compl. ¶ 2. The Parents allege that the Guidelines enable school "personnel to evaluate minor children about sexual matters and allow[] minor children, of any age, to transition socially to a different gender identity at school without parental notice or consent." *Id.* The Parents complain that the Guidelines "further require[] school personnel to enable this transition, including by using pronouns other than those consistent with the child's" sex assigned at birth.[3] *Id.* The Complaint contains no specific allegations regarding the application of the Guidelines in counseling their own children, and the Parents do not allege that their own children are transgender or gender nonconforming. *See generally id.*

---

[3]      I endeavor in this Opinion to use language that is consistent with the terminology provided in Appendix 1 of the American Psychological Association's Guidelines for Psychological Practice With Transgender and Gender Nonconforming People, available at https://www.apa.org/practice/guidelines/transgender.pdf. *See also* the Human Rights Campaign's Glossary of Terms, available at https://www.hrc.org/resources/glossary-of-terms.

A.     *The Guidelines*

The Parents attach a copy of the Guidelines, in their entirety, as Exhibit 1 to their Complaint. ECF 7-1, Guidelines. The first substantive page of the Guidelines includes the following introduction:

> Montgomery County Public Schools [] is committed to a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued. To this end, all students should feel comfortable expressing their gender identity, including students who identify as transgender or gender nonconforming. It is critical that all MCPS staff members recognize and respect matters of gender identity; make all reasonable accommodations in response to student requests regarding gender identity; and protect student privacy and confidentiality. To assist in these efforts, MCPS has developed the following guidelines for student gender identity that are aligned with the Montgomery County Board of Education's core values, guidance from the Maryland State Department of Education, and the Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency,* which prohibits discrimination, stigmatization, and bullying based on gender identity, as well as sex, gender, gender expression, and sexual orientation, among other personal characteristics. These guidelines cannot anticipate every situation which might occur. Consequently, the needs of each student must be assessed on a case-by-case basis.

*Id.* at 3.

Immediately following that introduction, the Guidelines identify the following "Goals":

- Support students so they may participate in school life consistent with their asserted gender identity;
- Respect the right of students to keep their gender identity or transgender status private and confidential;
- Reduce stigmatization and marginalization of transgender and gender nonconforming students;
- Foster social integration and cultural inclusiveness of transgender and gender nonconforming students;
- Provide support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

*Id.*

As informed by that backdrop, the Guidelines go on to provide guidance and instructions on how MCPS personnel can provide support and resources to transgender and gender

nonconforming students enrolled in Montgomery County Public Schools. The Guidelines address topics including: establishing a gender support plan; protecting student privacy; using the appropriate names and pronouns for transgender and gender nonconforming students; maintaining school records; dress code; participation in gender-based activities including physical education and school-based athletics; dealing with bullying and/or harassment of transgender and gender nonconforming students; and providing transgender and gender nonconforming students with designated safe spaces in their school buildings. Guidelines at 3–5.

Portions of the Guidelines explicitly anticipate parental involvement in developing a gender-support plan for transgender and nonconforming students. Other portions advise MCPS personnel to avoid disclosing a student's gender identity to their parents without the student's consent, particularly if the student has not yet disclosed their gender identity to their parents, or if the student either expects or knows their parents to be unsupportive. Those are the portions of the Guidelines that are primarily at issue in this case. They are reproduced below:

- GENDER SUPPORT PLAN:
  - The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school. The principal, designee, or school-based mental health professional (e.g., school psychologist or school counselor) should use MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity*, to support this process and assist the student in participating in school. The completed form must be maintained in a secure location and may not be placed in the student's cumulative or confidential files. While the plan should be consistently implemented by all school staff, the form itself is not intended to be used or accessed by other school staff members. *Id.* at 4.

- COMMUNICATION WITH FAMILIES:
  - Prior to contacting a student's parent/guardian, the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home. In some cases, transgender and gender nonconforming students may not openly

4

express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict. If this is the case, and support is required, the Office of School Support and Improvement or the Office of Student and Family Support and Engagement (OSFSE) should be contacted. In such cases, staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive. *Id.*

- PRIVACY AND DISCLOSURE OF INFORMATION:
  - o All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school. Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA). *Id.*
  - o Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure. It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school. *Id.*

- STAFF COMMUNICATION:
  - o Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth. *Id.* at 5.

Appended to the Guidelines is a copy of MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity* ("Intake Form"), which is provided by MCPS's Office of Student and Family Support and Engagement. *Id.* at 9–10. The Intake Form indicates that the "school administrator, counselor, or psychologist should complete [the] form with the student," and that the Intake Form is to be kept confidential as part of the process of establishing support for transgender and gender nonconforming students. The Intake Form states:

Parents/guardians may be involved if the student states that they are aware of and supportive of the student's gender identity. This form should be kept in a secure, confidential location. See distribution Information on Page 2. This form is not to be kept in the student's cumulative or confidential folders.[4] All plans should be evaluated on an ongoing basis and revised as needed.

*Id.*

The Intake Form also includes a section captioned "Support/Safety for Student," which asks the student: (1) whether their parents are aware of their gender identity; (2) to rank the level of support they have at home on a scale of one to ten; and (3) what considerations should be accounted for if parental support is low or lacking. *Id.*

B.     *The Complaint*

The Plaintiff Parents object to the Guidelines because, they argue, they inappropriately instruct MCPS schools to withhold information from parents regarding their children's gender identity as expressed at school. *See generally* Compl. The Parents assert seven causes of action in their Complaint. *Id.* In Count I, the Parents claim that the Guidelines violate "Maryland Family Law" by interfering with the Parents' statutory right and responsibility to provide their children with "support, care, nurture, welfare, and education." Compl. ¶¶ 44–49 (citing Md. Code, § 5-203 of the Family Law Article). In Count II, they allege that the Guidelines violate provisions of the Maryland Code of Regulations that require schools to maintain student records and to make those records available for parental review upon request. *Id.* ¶¶ 50–56. The Parents specifically allege that the Guidelines' instruction to keep the Intake Form confidential violates those provisions. *Id.* Count III asserts that the Guidelines violate the Parents' fundamental rights under the Maryland Declaration of Rights to "direct the care, custody, education, welfare, safety, and control of their minor children." *Id.* ¶¶ 57–66. In Count IV, the Parents allege that MCBE's policy "of withholding

---

[4]     In an apparent contradiction, the distribution information on Page 2 states that a copy of the Intake Form *should* be placed in the "School Confidential folder (in principal's office)."

records from Plaintiff Parents with respect to their children's" gender identity violates the Family

Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), as incorporated by Maryland

law. *Id.* ¶¶ 67–73. In Count V, the Parents allege that by "questioning a student about gender

identity and filling out [the Intake Form]" without parental consent," MCBE violates the Protection

of Pupil Rights Amendment, 20 U.S.C. § 1232h ("PPRA"). *Id.* ¶¶ 74–84. In Count VI, the Parents

assert that the Guidelines violate the Parents' fundamental right "to direct the care, custody,

education, and control of their minor children" under the Fourteenth Amendment to the United

States Constitution. *Id.* ¶¶ 85–90. And finally, in Count VII, the Parents seek injunctive,

declaratory, and monetary relief under 42 U.S.C. 1983, based on the constitutional and statutory

violations they allege in Counts I–VI. *Id.* ¶¶ 91–95; Opp. at 29–30.

Additional facts will be provided below as needed.

## STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) provides that a complaint must be dismissed if it "fails to state a

claim upon which relief can be granted." The purpose of the rule is to test the sufficiency of the

complaint, not to address its merits. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir.

2006). To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The claim for relief must be plausible,

and "threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 556 U.S. at 678–79.

When reviewing a motion to dismiss, the Court must accept the well pleaded facts in the

operative complaint, and also may "consider documents attached to the complaint, as well as

documents attached to the motion to dismiss, if they are integral to the complaint and their

authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013) (citing *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Significantly, when there is a conflict between the allegations of the complaint and an attached written instrument, "the exhibit prevails." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

## DISCUSSION

### I.   Constitutional claims

#### A.   The nature of the right asserted

The core claims in this action relate to the alleged violation of the Plaintiff Parents' substantive rights under the Due Process Clause of the Fourteenth Amendment to "direct the care, custody, education, and control of their minor children." Compl. ¶ 62. The Fourteenth Amendment's Due Process Clause protects the rights specifically enumerated in the first eight amendments to the United States Constitution, as well as "some rights that are not mentioned in the Constitution" but that are "deeply rooted in this Nation's history and tradition" and that are "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 2022 WL 2276808, at *7 (U.S. June 24, 2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

"The first (and often last) issue" when a plaintiff raises a substantive due process challenge under the Fourteenth Amendment "is the proper characterization of the individual's asserted right," and the determination of whether that right is fundamental. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005). Government actions that infringe on fundamental constitutional rights are subject to strict scrutiny and must be narrowly tailored in furtherance of a compelling government interest to pass constitutional muster. *Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir.

2014). Government actions that do not implicate a fundamental right need only clear the significantly lower hurdle of bearing a "rational" relationship to a "legitimate" government interest. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019).

To identify the nature of the Parents' asserted right, I must look to the Guidelines themselves. The Plaintiff Parents claim that the Guidelines instruct MCPS employees to "withhold[] information from parents with respect to their children's" gender identity, and that they implicitly "encourage children to distrust their parents" by asking children whether they wish to disclose their gender identities to their parents, and whether they anticipate receiving parental support. Opp. at 14. The Parents appear, moreover, to argue that the Guidelines reveal that MCBE has an agenda. Specifically, the Parents argue that the Guidelines require school personnel to "hide relevant information from parents because [] they do not want parents to have input on the topic [of gender identity] with their children" and that, in so doing, "MCBE has adopted a very definite position on this sensitive topic." Opp. at 17.

Having read the Guidelines carefully, I conclude that the Plaintiffs' reading is unsupported by the Guidelines' plain language for several reasons.

*First*, the language of the Guidelines makes clear that they are not intended to be inflexibly applied to every transgender and gender nonconforming student. Quite to the contrary, the Guidelines' introduction explicitly states that they "cannot anticipate every situation which might occur" and that "consequently, the needs of each student must be assessed on a case-by-case basis." Guidelines at 3. On the next page, they state again that "each student's needs should be evaluated on a case-by-case basis, and all [gender support] plans should be evaluated on an ongoing basis and revised as needed." *Id.* at 4. The Intake Form reiterates that "all plans should be evaluated on an ongoing basis and revised as needed." *Id.* at 4. This repeated language demonstrates that the

Guidelines are designed to apply flexibly in varied and evolving circumstances which, given the complexity and sensitivity of issues surrounding gender identity, are not conducive to a one size fits all approach.[5] Far from commanding the alleged interference with the parental rights that the Plaintiffs describe, the Guidelines carefully balance the interests of both the parents and students, encouraging parental input when the student consents, but avoiding it when the student expresses concern that parents would not be supportive, or that disclosing their gender identity to their parents may put them in harm's way. Put another way, to borrow from MCBE's Motion, "the Guidelines are just that—Guidelines." Motion at 14.

*Second*, the Guidelines cannot fairly be read to adopt a policy of excluding parents, inasmuch as they actively encourage familial involvement in the development and implementation of a transgender or gender nonconforming student's "Gender Support Plan" whenever possible. The Guidelines advise, for example, that the "principal (or designee), ***in collaboration with the student and the student's family (if the family is supportive of the student)***, should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school[.]" Guidelines at 4 (emphasis added). It is true that the Guidelines advise speaking with transgender and gender nonconforming students before contacting their families "to ascertain the level of support the student either receives or anticipates receiving from home," but it is also clear that familial involvement is preferred and encouraged, unless a student indicates that their family is not supportive of their gender identity. *Id.* The Guidelines caution that "in some

---

[5]      This is further evidenced by the absence of definitive language in the portions of the Guidelines that address confidentiality, *i.e.*, "a student's transgender status, legal name, or sex assigned at birth ***may*** constitute confidential medical information . . . The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, ***unless*** legally required to do so or ***unless*** students have authorized such disclosure . . . MCPS school staff members ***should*** use the student's legal name . . . ." (emphasis added).

cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance." *Id.* Even in those cases, the Guidelines provide that "staff will support the development of a student-led plan that ***works toward inclusion of the family***, if possible, taking safety concerns into consideration, as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive." *Id.* (emphasis added). The Guidelines recognize that "matters of gender identity can be complex and may involve familial conflict," and advise providing additional resources in such cases. *Id.* ("If this is the case, and support is required, the Office of School Support and Improvement or the Office of Student and Family Support and Engagement (OSFSE) should be contacted."). In sum, the Guidelines neither mandate nor encourage the exclusion or distrust of parents, but aim to include parents and other family in the support network they are intended to create.

*Finally*, the language that the Plaintiff Parents find objectionable must be read in the context of the Guidelines as a whole. The Guidelines were developed in furtherance of MCPS's commitment "to a safe and welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued." *Id.* at 3. To that end, the Guidelines state that "all students should feel comfortable expressing their gender identity" and that it "is critical that all MCPS staff members recognize and respect matters of gender identity; make all reasonable accommodations in response to student requests regarding gender identity; and protect student privacy and confidentiality." The Guidelines' purpose of maintaining the comfort, privacy, and safety of transgender and gender nonconforming students must inform how they are read and how they can reasonably be expected to be implemented. And

that includes those portions of the Guidelines that advise obtaining a transgender or gender nonconforming student's consent before disclosing their gender identity to their parents.

My review of the Guidelines reveals that the Plaintiff Parents' argument is based on a selective reading that distorts the Guidelines into a calculated prohibition against the disclosure of a child's gender identity that aims to sow distrust among MCPS students and their families. In reality, the Guidelines instruct MCPS staff to keep a student's gender identity confidential until the student consents to the disclosure out of concern for the student's well-being, and as a part of a more comprehensive gender support plan that anticipates and encourages eventual familial involvement whenever possible.

Accordingly, in assessing the constitutionality of the Guidelines, I must consider whether the Plaintiffs constitutional rights as parents encompasses a fundamental right to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child. As explained below, there is no such fundamental right under the Due Process Clause of the Fourteenth Amendment.

### B.   The Guidelines are subject to rational basis review, which they satisfy

The Supreme Court has long held that a parent's right to make decisions regarding the care, custody, and control of their children is a "fundamental liberty interest," which includes the right to "direct the upbringing and education of children under their control." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Wisconsin v. Yoder*, 406 U.S. 205, 232 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). "The Supreme Court has never been called

upon to define the precise boundaries of a parent's right to control a child's upbringing and education," but "it is clear that the right is neither absolute nor unqualified." *Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (quoting *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 182 (3rd Cir.2005)).

The Supreme Court first recognized a parent's right to direct the education of their children in *Meyer v. Nebraska*, 262 U.S. 390 (1923). In *Meyer*, the Court concluded that parents are constitutionally entitled to seek out a specific kind of education (in *Meyer*, German language instruction) under the Fourteenth Amendment's Due Process Clause. Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the Supreme Court applied *Meyer* and held that a state law requiring parents to send their children to public school was unconstitutional because it "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534 (citing *Meyer*, 262 U.S. at 390).

The Plaintiff Parents rely heavily on the broad language in *Meyer* and *Pierce* in support of their argument that strict scrutiny should apply in this case.[6] But subsequent Supreme Court

---

[6]     The Plaintiff Parents also cite to the Supreme Court's more recent opinion in *Troxel v. Granville*, 530 U.S. at 65. *Troxel* is a plurality opinion, which was decided in a very different context. In *Troxel*, the Court was asked to review what Justice O'Connor characterized as a "breathtakingly broad" statute that allowed "any person" to petition a court for visitation rights, and permitted the court to order visitation with any such person if it was deemed to serve the child's best interests. *Id.* In other words, *Troxel* is a decision related to parent's fundamental right to direct their child's "care, custody, and control," — it has nothing to do with a parent's right to dictate the actions or inactions of a public school system. At least two federal circuits have distinguished *Troxel* on that basis. *See Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) ("*Troxel* is not so broad as plaintiffs assert. The cases cited by the Court in *Troxel* as establishing this parental right pertain either to the custody of children, which was also the issue in dispute in *Troxel*, or to the fundamental control of children's schooling, as in *Yoder*."); *Leebaert v. Harrington*, 332 F.3d 134, 141–42 (2d Cir. 2003) ("But there is nothing in *Troxel* that would lead us to conclude from the Court's recognition of a parental right in what the plurality called 'the care, custody, and control' of a child with respect to visitation rights that parents have a fundamental right to the upbringing and education of the child that includes the right to tell public schools what to teach or what not to teach[.]"). Furthermore, the plurality in *Troxel* did not identify the level of

decisions have emphasized that the rights identified in *Meyer* and *Pierce* are limited. The Court

has noted, for example, that *Pierce* "len[ds] no support to the contention that parents may replace

state educational requirements with their own idiosyncratic views of what knowledge a child needs

to be a productive and happy member of society." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976)

(quoting *Yoder*, 406 U.S. at 239 (White, J. concurring)). Instead, *Pierce* "held simply that while a

State may posit (educational) standards, it may not pre-empt the educational process by requiring

children to attend public schools." *Id.* In another subsequent decision, the Court again "stressed

the 'limited scope of *Pierce*'" as "simply 'affirm[ing] the right of private schools to exist and to

operate." *Id.* (quoting *Norwood v. Harrison*, 413 U.S. 455 (1972)).[7]

The Fourth Circuit has recognized the limitations on the parental rights established in

*Meyer* and *Pierce* and has rejected the application of strict scrutiny to claims regarding a parent's

right to direct a child's education that do not include a religious element. The Fourth Circuit

explored the relevant law in detail in *Herndon v. Chapel Hill-Carrboro Board of Education*, 89

F.3d 174 (4th Cir. 1996) and concluded that the Supreme Court had never expressly determined

the appropriate standard of constitutional review for claims involving parental rights in the

educational context.[8] *Herndon v. Chapel Hill-Carrboro Board of Education*, 89 F.3d 174 (4th Cir.

---

constitutional scrutiny they applied in concluding that the challenged statute violated the parent's
due process rights. *Troxel*, 530 U.S. at 80 (Thomas, J., concurring in the judgment) ("The opinions
of the plurality . . . recognize such a right, but curiously none of them articulates the appropriate
standard of review.").

[7]     *See also Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) (explaining that *Meyer*
"protected 'the subject matter … taught at… private school' and that [] [*Pierce*] established a
parental right to 'send … children to a particular private school rather than a public school.'").

[8]     The Fourth Circuit noted that *Meyer* and *Pierce* were both decided in the 1920s, and that
the now-familiar "tiered framework" was not articulated until 1961, and "was not expressly
embraced by a majority of the [Supreme] Court until 1971." *Id.* (citing *Poe v. Ullman*, 367 U.S.
497, 548 (1961) (Harlan, J., dissenting); *Graham v. Richardson*, 403 U.S. 364, 375 (1971)).

1996). The closest the Supreme Court had come, the Fourth Circuit found, was in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), in which the Supreme Court "overturned convictions of Amish parents for removing their children from school before age sixteen." *Herndon*, 89 F.3d at 178. *Yoder* reaffirmed that "parental rights are among the liberties protected by the Constitution," and held that "when those rights combine with First Amendment free exercise concerns . . . they are fundamental." *Herndon*, 89 F.3d at 178. It did not, however, determine "whether the parental rights standing alone, in nonreligious contexts, are 'fundamental' in the constitutional sense[.]" *Id*.

 *Herndon* went on to note that both *Yoder* and the Supreme Court's later decision in *Runyon v. McCrary* contain "instructive dicta" indicating that rational basis is the appropriate standard of constitutional review for claims that involve a parent's right to direct their child's public school education in the absence of a related Free Exercise concern.[9] *Id.* (citing *Yoder*, 406 U.S. at 215 ("We must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to *reasonable* state regulation of education if it is based on purely secular considerations.") (emphasis provided in *Herndon*); *Runyon*, 427 U.S. at 163 ("The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by *reasonable* government regulation.") (emphasis provided in *Herndon*). The Fourth Circuit summarized the collective effect of the Supreme Court authority on the subject as follows:

---

[9]     There has been "a great deal of discussion and disagreement" among the Circuits Courts regarding "hybrid" claims that allege both an infringement on a parental right and a Free Exercise claim. *Parker*, 514 F.3d at 97–99. Here, the Plaintiff Parents allude to religious concerns but do not raise a Free Exercise claim. *See* Opp. at 26–27.

> From *Meyer* to *Runyon*, the Supreme Court has stated consistently that parents have
> a liberty interest, protected by the Fourteenth Amendment, in directing their
> children's schooling. Except when the parents' interest includes a religious element,
> however, the Court has declared with equal consistency that reasonable regulation
> by the state is permissible even if it conflicts with that interest. **That is the
> language of rational basis scrutiny.**

*Id.* at 178 (emphasis added).

Other federal circuits have likewise concluded that the *Meyer-Pierce* line of cases do not

establish a "fundamental right" for parents to dictate the nature of their children's education in

public schools that requires the application of strict scrutiny. The Sixth Circuit, in rejecting a

constitutional challenge to a school dress code, stated:

> The critical point is this: While parents may have a fundamental right to
> decide *whether* to send their child to a public school, they do not have a
> fundamental right generally to direct *how* a public school teaches their child.
> Whether it is the school curriculum, the hours of the school day, school discipline,
> the timing and content of examinations, the individuals hired to teach at the school,
> the extracurricular activities offered at the school or, as here, a dress code, these
> issues of public education are generally committed to the control of state and local
> authorities.

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (emphasis in original).

The Second Circuit similarly rejected a parent's claim that he was constitutionally entitled

to exempt his child from a mandatory health education class and found that "*Meyer, Pierce*, and

their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a

public school what his or her child will and will not be taught. . . . [The] recognition of such a

fundamental right . . . would make it difficult or impossible for any public school authority to

administer school curricula responsive to the overall educational needs of the community and its

children." *Leebaert*, 332 F.3d at 141. And the Ninth Circuit, affirming the dismissal of a § 1983

action against a public school district for distributing a survey to elementary aged students that

included questions about sex, held that "there is no fundamental right of parents to be

16

the *exclusive* provider of information regarding sexual matters to their children, either independent of their right to direct the upbringing and education of their children or encompassed by it. We also hold that parents have no due process or privacy right to override the determinations of public schools as to the information to which their children will be exposed while enrolled as students." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1200 (9th Cir. 2005).

Discussion of the above-summarized cases is conspicuously absent from the Plaintiff Parents' Opposition. Most notably, the Plaintiff Parents make no attempt to distinguish *Herndon*, which MCBE explicitly, and correctly, cites as controlling authority in this case. Instead, the Plaintiff Parents cite the Eleventh Circuit's decision in *Arnold v. Board of Education of Excambia County, Alabama*, 880 F.2d 305 (11th Cir. 1989) as the case "most analogous" to this one. Opposition at 6–7. The *Arnold* Court summarized the relevant facts as follows:

> On March 10, 1986, Jane Doe and John Doe discovered that Jane was pregnant. On March 27, 1986, Kay Rose summoned Jane to her office for counseling. After speaking with Jane, Rose summoned John Doe to her office where he admitted paternity. At the expense of the school board, Rose procured a pregnancy test for Jane which proved positive. Rose informed [Vice Principal] Powell of Jane's pregnancy on April 2, 1986.
>
> The counselors then allegedly coerced the children to agree to abort the child. Because the children were financially unable to afford the medical services attendant to an abortion, the school officials paid Jane and John to perform menial tasks for them. On May 8, 1986, Powell allegedly gave $20.00 to the individual who drove the children to the medical facility in Mobile, Alabama where Jane obtained the abortion.
>
> The complaint alleges that Rose and Powell "coerced" the children "in diverse respects and so fundamentally imposed their wills upon the children that the children were unable to exercise any freedom of choice with regard to the decision whether or not to agree to the termination of the pregnancy." Further, the plaintiffs allege that the school officials "coerced these children to refrain from notifying their parents regarding the matter" and "to maintain the secrecy of their plan" to obtain an abortion for Jane.

*Id* at 308–09.

Based on those extreme facts (entirely absent here), the Eleventh Circuit concluded that "a parent's constitutional right to direct the upbringing of a minor is violated when the minor is **coerced** to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion; a decision which touches fundamental values and religious beliefs parents wish to instill in their children." *Id.* at 312 (emphasis added).

*Arnold* clearly is distinguishable from this case. Here, the Parents allege no specific facts regarding the application of the Guidelines to a particular student, but argue that they nevertheless rise to the same level of coercive interference with the parent-child relationship and familial privacy as a school counselor actively discouraging students from disclosing their pregnancy, coercing them to obtain an abortion, and assisting them in raising the funds to finance it. The plain language of the Guidelines belies the Parents' position, particularly given that the Guidelines actively *encourage* parental participation in developing a student's gender support plan. *See* Section A, *above*.

Furthermore, the Plaintiff Parents ignore critical language in the *Arnold* opinion that directly undermines their argument. Far from mandating parental notification, the Eleventh Circuit in *Arnold* took pains to emphasize that the decision to notify the parents of the pregnancy rested with the student herself. In other words, the constitutional issue in *Arnold* arose out of school personnel coercing the students not to notify their parents, not from their failure to notify the parents themselves (regardless of the students' wishes). Equally noteworthy is the failure of the Plaintiff Parents to acknowledge the Eleventh Circuit's recognition of the importance of the minor student's own discretion regarding whether to seek parental involvement:

> **[W]e are not, as appellees argue, constitutionally mandating that counselors notify the parents of a minor** who receives counseling regarding pregnancy. We hold merely that the counselors must not coerce minors to refrain from communicating with their parents. **The decision whether to seek parental**

> **guidance, absent law to the contrary, should rest within the discretion of the minor**. As a matter of common sense, **not constitutional duty**, school counselors should encourage communication with parents regarding difficult decisions such as the one involved here.

*Arnold*, 880 F.2d at 314.

The Plaintiff Parents also cite as analogous the Third Circuit's decision in *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000). Like *Arnold*, *Gruenke* involves an extreme example of school personnel becoming unduly involved in a student's pregnancy. In *Gruenke*, a high school swim coach forced one of his seventeen-year-old team members to take a pregnancy test, and went on to spread rumors about her pregnancy in the school community, all without informing the teen's parents. *Id.* at 308–09. A guidance counselor was aware of the situation, but did not encourage the swim coach to disclose the pregnancy to the student's parents, and did not inform the parents herself. The Third Circuit, citing *Arnold*, noted it had "considerable doubt about [the school counselor's] right to withhold information of this nature from the parents," and went on to conclude that the swim coach's actions established "an unconstitutional interference" with familial relations and privacy, noting specifically that the coach "was not a counselor whose guidance was sought by a student, but instead, someone who was acting contrary to her express wishes that he mind his own business." *Id.* In that context, the Third Circuit noted:

> School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution. Public schools must not forget that "in loco parentis" does not mean "displace parents."
>
> It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights. State deference to parental control over children is underscored by the [Supreme] Court's admonitions that "[t]he child is not the mere creature of the State," *Pierce, 268 U.S. at 535*, and that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233.

*Id.*

The Third Circuit's point regarding the primacy of the parents over educators in counseling their children is well taken, but *Gruenke* bears little factual resemblance to this case. Although the Plaintiff Parents claim that the Guidelines "cut [] parents out of the action systemically if they are deemed unsupportive," the Guidelines themselves contain no such rigid policy, and the Parents have not alleged any facts that suggest that any member of MCPS staff has applied them in that way, let alone that anyone at MCPS either "coerced" a transgender or gender nonconforming student to withhold information from their parents, or "affirmatively interfered with" any parent's constitutional rights.[10]

This Opinion should not be read to foreclose the possibility that, under some circumstances, a school actor may impermissibly interfere with the parental role in counseling a transgender or gender nonconforming child. One can envision a scenario in which interference by school personnel might rise to the level described in *Arnold* or *Gruenke.* But due to the nature of the Guidelines, and because the Plaintiff Parents challenge the Guidelines on their face, this case bears a much closer resemblance to those addressing curricular challenges and other public school policy decisions, which are subject to rational basis review.

Additionally, despite the Parents' assertion that they "are not attempting to dictate a curriculum about transgenderism or to change MCBE bullying guidelines," the Plaintiff Parents' Opposition strongly suggests that their objections to the Guidelines are not limited to the portions

---

[10]     *See Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 266 (3d Cir. 2007) ("We recognized in *Gruenke* that '[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children....' **However, that recognition does not extend to circumstances where there is no manipulative, coercive, or restraining conduct by the State**.") (emphasis added).

addressing parental disclosure. The Opposition states that the Guidelines "assume that transgenderism is a normal, and normative, condition," and offers as a counterpoint various "scientific," "philosophical," "medical," and "religious" bases in support of the Plaintiffs' presumably contrary view. But it is clear in the case law that parents do not have a constitutional right to dictate a public school's curriculum or its approach to student counseling, for any of those reasons. *See, e.g., Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) (finding no violation of parental rights, privacy rights, or free exercise rights when a public school district included books depicting same sex relationships in its curriculum); *Blau*, 401 F.3d at 395–96. As the Ninth Circuit explained in the context of a challenged sexual education curriculum:

> Neither *Meyer* nor *Pierce* provides support for the view that parents have a right to prevent a school from providing any kind of information—sexual or otherwise—to its students. . . . *Meyer* and *Pierce* do not encompass [the] broad-based right [the parent-plaintiffs seek] *to restrict the flow of information* in the public schools. Although the parents are legitimately concerned with the subject of sexuality, there is no constitutional reason to distinguish that concern from any of the countless moral, religious, or philosophical objections that parents might have to other decisions of the School District—whether those objections regard information concerning guns, violence, the military, gay marriage, racial equality, slavery, the dissection of animals, or the teaching of scientifically-validated theories of the origins of life. Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent. Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy.

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *opinion amended on denial of reh'g sub nom. Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187 (9th Cir. 2006).[11]

---

[11]     *See also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005) ("Further, while it is true that parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship, a myriad of influences surround middle and high school students everyday, many of which are beyond the strict control of the parent or even abhorrent to the parent. . . . A **parent whose middle or high school age child is exposed to sensitive topics or information in a survey remains free to discuss these matters and to place them in the family's moral or religious context**, or to supplement the information with more appropriate materials.") (emphasis added).

Accordingly, in light of the authority summarized above, I conclude that MCBE correctly argues that rational basis review applies to this claim regarding the Guidelines' alleged violation of the Plaintiff Parents' right to direct their children's education. And because the Guidelines are subject to rational basis review, the Guidelines need only "bear some rational relationship to a legitimate state interest" to pass constitutional muster. *Herndon*, 89 F.3d at 179 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 32 (1973).

MCBE easily meets that standard. MCBE certainly has a legitimate interest in providing a safe and supportive environment for all MCPS students, including those who are transgender and gender nonconforming. And the Guidelines are certainly rationally related to achieving that result.

Even assuming momentarily that the Guidelines *were* subject to strict scrutiny (they are not), I would conclude that they satisfy that standard as well. To survive strict scrutiny, MCBE would be required to demonstrate that the Guidelines are narrowly tailored in furtherance of a compelling government interest. *Bostic*, 760 F.3d at 377. MCBE argues that the Guidelines further their compelling interest in: (1) "protecting their students' safety and ensuring a 'safe, welcoming school environment where students . . . feel accepted and valued'"; (2) "not discriminating against transgender and gender nonconforming students"; and (3) "protecting student privacy." Motion at 18–20.

The law cited by MCBE supports finding that its interest is compelling. The Supreme Court has found it "evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling," and as a result has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 756 (1982) (internal quotations and citations omitted). More recently, the Supreme Court

22

has held that transgender individuals are protected from discrimination under Title VII. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Guided by that conclusion, the Fourth Circuit has held that the same is true under Title IX, and held that a school's policy requiring a transgender student to use the bathroom based on his sex assigned at birth to be in violation of the statute. *Grimm v. Gloucester Cnty School Bd.*, 972 F.3d 584 (4th Cir. 2020). In that same decision, the Fourth Circuit also found, applying intermediate scrutiny, that the school's bathroom policy violated the student's rights under the Equal Protection Clause, and it recognized a school's "interest in protecting student's privacy" as "important." *Id.*; *see also Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 271 (3d Cir. 2007) (recognizing that "minors are individuals who enjoy constitutional rights of privacy under substantive due process.").

Furthermore, MCBE's concerns about the safety and well-being of transgender and gender nonconforming students in particular are neither theoretical nor fanciful. Research demonstrates that transgender and gender nonconforming students are substantially more likely to be bullied or harassed than their cisgender peers. *See, e.g.,* Amicus Brief at 6 and sources cited therein.[12] The Plaintiff Parents themselves acknowledge that transgender and gender nonconforming students are at a heightened risk of suicide. Compl. ¶ 15; Motion at 26. The Maryland Department of Education noted in its 2015 "Guidelines for Gender Identity Non-discrimination," that "research indicates that 80 percent of transgender students feel unsafe a school because of who they are," leaving students unable to focus on their education, and leading some students to miss classes or leave

---

[12]    The Fourth Circuit, too, recognizes these heightened risks. *Grimm*, 972 F.3d at 597 ("77% of respondents who were known or perceived as transgender in their K-12 schools reported harassment by students, teachers, or staff."). Just this week, the Fourth Circuit reiterated that individuals suffering from gender dysphoria (which, as the Fourth Circuit explains, is not the same thing as simply being transgender) are at risk of depression, substance abuse, self-harm, and suicide. *Williams v. Kincaid*, No. 21-2030, 2022 WL 3364824, at *5 (4th Cir. Aug. 16, 2022).

school entirely.[13] And all of these concerns are compounded when a student also lacks support at home. *See* Amicus Brief at 9–13. For those reasons, I agree with MCBE that the Guidelines further a compelling state interest.

I also agree that the Guidelines are narrowly tailored in furtherance of that interest. The Guidelines do not aim to exclude parents, but rather anticipate and encourage family involvement in establishing a gender support plan. Guidelines at 4. Even where family support is lacking, the inclusion of family is identified as an eventual goal. *Id.* The Guidelines, on their face, are noncoercive, and serve primarily as a means of creating a support system and providing counseling to ensure that transgender children feel safe and well at school. And, importantly, they apply to each student on a case by case basis.[14] By advising that school personnel keep a transgender or

---

[13]    These Maryland Department of Education guidelines, which MCBE's Guidelines substantially track, advise that transgender and gender nonconforming students should be permitted "to discuss and express their gender identity openly and to decide, when, with whom, and how much private information may be shared." Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination,                                (2015),                                available                                at https://www.marylandpublicschools.org/about/Documents/DSFSS/SSSP/ProvidingSafeSpacesTr ansgendergenderNonConformingYouth012016.pdf

[14]    The Parents filed a Notice of Supplemental Authority, ECF No. 58, directing my attention to the District of Kansas's decision in *Ricard v. USD 475 Geary Cnty, KS, School Board*, No. 522CV04015HLTGEB, 2022 WL 1471372 (D. Kan. May 9, 2022), in which the District of Kansas granted a preliminary injunction to a teacher on First Amendment grounds. The teacher in that case argued that the policy of prohibiting the disclosure of a student's gender identity at school (if it differs from that usually associated with their sex assigned at birth) absent the student's consent violated her Christian beliefs that "the Bible prohibits dishonesty and lying." *Id.* at 4. Although the opinion was decided on First Amendment grounds, the District of Kansas noted in its analysis, citing *Troxel*, 530 U.S. at 65, that "parents have a constitutional right to control the upbringing of their children," identified that right as fundamental, and therefore concluded that "whether the [school district] likes it or not, that constitutional right includes the right of a parent to have a say in what a minor child is called and by what pronouns they are referred." *Id.* at 8. But there is nothing in the MCBE Guidelines that divests parents from having a say in what a minor child is called or by what pronoun they are referred. I note as well that the court in *Ricard* specifically observed that "the Court can envision that a school would have a compelling interest in refusing to disclose information about [] names or pronouns when there is a particularized and substantiated concern that disclosure to a parents could lead to child abuse, neglect, or some other <u>illegal</u>

gender nonconforming student's gender identity confidential unless and until that student consents to disclosure, they both protect the student's privacy and create, as MCBE puts it "a zone of protection . . . in the hopefully rare circumstance when disclosure of [the student's] gender expression while at school could lead to serious conflict within the family, and even harm." Motion at 28. If the Guidelines mandated parental disclosure as the Plaintiff Parents urge, their primary purpose of providing transgender and gender nonconforming students with a safe and supportive school environment would be defeated. A transgender child could hardly feel safe in an environment where expressing their gender identity resulted in the automatic disclosure to their parents, regardless of their own wishes or the consequences of the disclosure. Accordingly, I find that, although they are subject only to rational basis review, the Guidelines also satisfy both prongs of the strict scrutiny analysis.

For those reasons, I conclude that the Plaintiff Parents' facial challenge under the Due Process Clause of the Fourteenth Amendment fails as a matter of law and must be dismissed. And because amendment would be futile, it is dismissed with prejudice.

---

conduct" and that an "appropriately tailored policy would, instead, make an individualized assessment whether there is a particularized and substantiated concern of real harm—as opposed to a generalized concern of parental disagreement—and prohibit disclosure only in those limited instances." *Id.* at 8. The Guidelines in this case closely resemble the "appropriately tailored" policy imagined by the court in *Ricard*.

The Parents more recent Notice of Supplemental Authority, ECF No. 57, cites a dissenting opinion from the Supreme Court of Wisconsin, which is, obviously, not binding on this Court (or any other). *See Doe 1 v. Madison Metro. Sch. Dist.*, 976 N.W.2d 584 (Wi. 2022). It also cites the opinion of the Middle District of Alabama in *Eknes-Tucker v. Marshall*, No. 2:22-CV-184-LCB, 2022 WL 1521889, at *4 (M.D. Ala. May 13, 2022), which affirmed a parent's fundamental right to direct their children's medical care and enjoined the enforcement of a statute that forbade treating transgender children with medically prescribed hormones. That issue is not before me in this case.

C. *The Plaintiffs have failed to plead an as applied challenge*

The Plaintiff Parents allege in their Complaint that they challenge the Guidelines on their face and as applied. Compl. ¶ 11. As discussed above, however, both the Complaint and the Parents' Opposition to MCBE's Motion to Dismiss are devoid of any specific factual allegations that might support an as applied challenge. The closest the Parents have come to asserting facts challenging any specific application of the Guidelines relating to them is to allege in their Complaint that, "[u]pon information and belief, MCBE has instructed MCPS personnel not to make completed MCPS Form[] 560-80 [(the Intake Form)] available to the parents of minor children . . . unless the minor child consents to its disclosure to the parents" and to allege that "MCPS personnel have been trained in the MCPS Policy and have conformed their behavior and practices with the MCPS Policy, including by withholding information from parents about their child's transgender election at school if the child has not desired that information to be transmitted to the parents and by keeping such information out of the school records to which parents are given access." Compl. ¶¶ 26–28. These generalized allegations are plainly insufficient to challenge the Guidelines as applied.

Fed. R. Civ. P. 11(b)(3) instructs that when an attorney presents the court with a "pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it," that attorney "certifies that to the best of [their] knowledge, information, and belief, formed after reasonable inquiry under the circumstances . . . the factual contentions have evidentiary support or, ***if specifically so identified***, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" *Id.* (emphasis added). This rule "was not intended to allow naked speculation or to relieve parties from their duties to perform a pre-submission investigation. Rather, it simply recognizes that there will be times when parties 'have good reason to believe that

a fact is true' but need further factfinding or discovery to assemble the supporting proof." Steven S. Gensler & Lumen N. Mulligan, <u>Federal Rules of Civil Procedure Rules and Commentary</u> 274 (2022 Ed.) (citing Fed. R. Civ. P. 11 advisory committee's note (1993)). "To rely on this provision, the party must specifically identify that the factual contention is being made on that basis." *Id.*

The Plaintiff Parents were afforded but declined the opportunity to amend their Complaint to address its alleged deficiencies before MCBE filed its Motion to Dismiss. ECF No. 29, *Paperless Order Memorializing 1/19/21 Pre-Motion Conference.* And they did not indicate either in their Complaint or their Opposition to MCBE's Motion to Dismiss that obtaining the evidentiary support for their allegations related to the application of the Guidelines would require further investigation or discovery. Accordingly, because they failed to invoke Rule 11(b) and failed to plead sufficient facts to support an as applied challenge, their as applied challenge must be dismissed. The Plaintiffs' as applied challenge is dismissed without prejudice, but without leave to amend. *See Britt v. DeJoy*, No. 20-1620, (4th Cir., August 17, 2022), *on reh'g en banc*.

### D.  *The Plaintiffs have failed to state a claim under 42 U.S.C. § 1983*

Because the Plaintiffs have failed to plead a federal constitutional violation, Count VII of the Complaint, which alleges a violation of 42 U.S.C. § 1983, must likewise be dismissed. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]" Section 1983 "does not confer any substantive rights; rather, it supplies a remedy for rights conferred by other federal statutes or by the Constitution." *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 444 (4th Cir. 2014). In other words, Section 1983 simply provides the "mechanism" for an injured party to

recover damages from the person who, acting under color of law, violated their rights under the U.S. Constitution or federal statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 288–290 (2002). Therefore, a plaintiff seeking relief under Section 1983 must first demonstrate the violation of the Constitution or federal statute.

The only federal claim in the Plaintiff Parents' Complaint (aside from their Section 1983 claim) is Count VI, alleging MCBE violated the Parents' parental rights under the United States Constitution. As explained in the preceding sections, Count VI is dismissed because the Parents' facial challenge to the Guidelines fails as a matter of law, and the Parents have failed to plead an as applied challenge. Accordingly, without any violation of federal law to form the basis for a Section 1983 claim, Count VII must also be dismissed without prejudice and without leave to amend. *See Britt v. DeJoy*, No. 20-1620, (4th Cir., August 17, 2022), *on reh'g en banc*.

### E. *The Guidelines do not violate the Maryland Declaration of Rights*

The Plaintiff Parents argue next that Count III, which asserts a violation of the Maryland Declaration of Rights, must survive MCBE's Motion to Dismiss because Article 24 provides broader protections than the Fourteenth Amendment's Due Process Clause, its federal equivalent. Compl. ¶¶ 57–66; Opp. at 25–26. The Plaintiff Parents cite no law identifying the contours of Article 24's greater protections in the context of this case, but instead urge the Court to "certify the issue[] for definitive resolution by the Maryland Court of Appeals." Opp. at 2–3.

"Pursuant to Maryland law, a court of the United States may certify a question to the Court of Appeals of Maryland if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of [Maryland]." *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (quoting Md. Code, § 12–603 of the Courts and Judicial Proceedings Article). "It is well established that the decision

to certify a question to the Court of Appeals of Maryland is not obligatory and "rests in the sound discretion of the federal court." *Hafford v. Equity One, Inc.*, No. CIV.A. AW-06-0975, 2008 WL 906015, at \*4 (D. Md. Mar. 31, 2008). "Only if the available state law is clearly insufficient should the court certify the issue to the state court." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994). When there is guidance available from which a federal court may make a "reasoned and principled conclusion," the federal court should decide the case itself. *Hafford*, 2008 WL 906015, at \*4.

There is no question that the scope of the protections of Article 24 is determinative of issues pending in this case. If Article 24 provides the protections urged by the Plaintiff Parents, their claims grounded in Article 24 survive MCBE's Motion to Dismiss. If Article 24 provides the same protections as the Due Process Clause of the Fourteenth Amendment, they do not. The remaining question is whether there is sufficient guidance under Maryland law regarding Article 24's application in this case to decide the issue in this Court.

The Maryland Court of Appeals' "precedent states clearly that the Maryland and Federal due process provisions have been read '*in pari materia*'." *Koshko v. Haining*, 921 A.2d 171, 194 (Md. 2007) (collecting cases). The Court has also been clear, though, that "this principle of reading the provisions in a like manner does not [] reduce [its] analysis to a mere echo of the prevailing Fourteenth Amendment jurisprudence." *Id.* In certain instances, Maryland's high court has, indeed, "read Maryland's due process clause more broadly than the federal constitution." *Id.*

MCBE acknowledges that Article 24 is not always coextensive with substantive due process under Fourteenth Amendment, but correctly observes that "Plaintiffs cite nothing establishing that Article 24 has a broader reach in *this* context, where parents seek to override the reasonable educational judgments of school authorities." Reply at 18.

29

The Plaintiff Parents rely on the Maryland Court of Appeals' decision in *Koshko v. Haining*, in which the Court of Appeals noted the broader protections of Article 24 in the context of child custody and visitation. Opp. at 35. The Parents cite no law, and I have found none, that suggest that Article 24 creates broader protections in the different context of a parent challenging matters of public school policy or curriculum. To the contrary, the Maryland Court of Appeals emphasized in *In re Gloria H.* that Maryland public school systems and boards of education "are vested with control over educational matters . . . . the local authorities are empowered to determine the educational policies within their own school districts." 979 A.2d 710, 721 (Md. 2009) (quoting *Hornbeck v. Somerset Co. Bd. of Educ.*, 458 A.2d 758 (Md. 1983)). In the same decision, although it is not itself a constitutional case, the Court of Appeals quoted with approval the following language from the Sixth Circuit's decision in *Blau*, which in turn relies on the Fourth Circuit's decision in *Herndon*:

> The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau*, 401 F.3d at 395–96 (collecting cases and citing *Herndon*, 89 F.3d at 176).

This case involves "how" the MCPS teaches its students, and not the issue of the Parent Plaintiffs' fundamental right to decide "whether" to send their children to public school. Further, it does not involve parental rights regarding child custody or visitation. Therefore, it falls squarely within the realm of cases where the Maryland Court of Appeals has favorably cited federal cases, thereby supporting the conclusion that the protections afforded by Article 24 are no broader than are afforded under the Fourteenth Amendment in this context.

Accordingly, I conclude that the fact that Article 24 provides broader protections in contexts unrelated to the issues in this case does not warrant certification and deferral of the state constitutional question in light of the well-established deference to public schools' educational decisions under Maryland law. And, because the Parent Plaintiffs' Fourteenth Amendment claims fail, so too do their Article 24 claims. They are dismissed with prejudice.

## II.   Statutory Claims

### A.  Maryland Code § 5-203 of the Family Law Article

In Count I of their Complaint, the Plaintiff Parents allege that "the MCPS Policy of withholding information from parents directly related to their minor children's support, care, nurture, welfare, and education have violated § 5-203 of the Family Article and have directly hindered Plaintiff Parents from carrying out their statutory duties under that section." Compl. ¶ 49. The Parents specifically cite the following subsection:

> (a)(1) The parents are the joint natural guardians of their minor child.
> ….
> (b) The parents of a minor child, as defined in § 1-103 of the General Provisions
>     Article:
>     (1) are jointly and severally responsible for the child's support, care, nurture,
>         welfare, and education; and
>     (2) have the same powers and duties in relation to the child.

Md. Code, Fam. Law § 5-203 ("FL").

Based on that language, the Parents assert that they "have the power under the statute to deal with their children's gender dysphoria and to complain when public schools take affirmative steps to restrict their right to do so." Opp. at 27. From there, the Plaintiffs reason that "Section 5-203(b) thus carries with it a common-law right of action for damages and other appropriate relief when violated, just as the parallel constitutional right does." *Id.* MCBE counters that Maryland courts have only cited Section 5-203 and the rights it memorializes in connection with child

custody disputes, and "to hold parents responsible for failing to obtain necessary treatment for their children." Motion to Dismiss at 35.

Section 5-203(b) "defines globally the role of a parent," and the powers and duties identified in Section 5-203(b) are "closely associated" with the Maryland Court of Appeals' "long-standing recognition that parents are presumed to act in their children's best interests." *BJ's Wholesale Club, Inc. v. Rosen*, 80 A.3d 345, 353 (Md. 2013). The Court has explained that there are "clear societal expectations" under Maryland law that "parents should make decisions pertaining to their children's welfare, and that those decisions are generally in the child's best interest." *Id.* Those expectations are "manifest in statutes that enable parents to exercise their authority on behalf of their minor child in the most important aspects of a child's life, including significant physical and mental health decisions" as well as "the most significant decisions pertaining to a child's education and employment." *Id. at 354.* Regarding those "most significant" educational decisions, the Court of Appeals stated that "parents may: choose to home school their children; and choose to defer compulsory schooling for one year if a parent determines that the child is not mature enough to begin schooling." *Id.* (citing Md. Code § 7-301 of the Education Article). But the Court did not elaborate any further. This appears to be the closest Maryland courts have come to finding that Section 5-203(b) establishes an actionable right associated with a parent's responsibility for their children's education. The Plaintiff Parents cite no law, and I have found none, invoking Section 5-203(b) to establish a common-law right of action against a public school based on a disagreement with a school's curriculum or counseling policy.

Aside from broadly defining the role of parents, the primary function of Section 5-203 is to establish one parent's rights and obligations vis-à-vis the other. Subsection (a) memorializes the parents' status as "joint natural guardians of their minor child." FL § 5-203(a). Subsection (b)

explains that each parent has the "same powers and duties" in relation to their child, and that they are "jointly and severally liable for the child's support, care, nurture, and welfare." FL § 5-203(b). And subsection (d) addresses child custody rights as between two parents, stating that neither is presumed to have a superior right, and that a court may award custody to either parent, or jointly to both.[15] FL § 5-203(d).

Section 5-203(b)'s function is borne out in the caselaw that cites it, which primarily concerns issues regarding child custody, child support, and a parent's obligations to attend to their children's medical needs. *See, e.g., Petrini v. Petrini*, 648 A.2d 1016, 1018–19 (1994) ("That both parents have a legal as well as a moral obligation to support and care for their children is well-settled in Maryland"). In light of the statutory language of section 5-203(b), its application by Maryland courts in contexts unrelated to the facts of this case, Maryland's well-established deference to public schools' educational decisions (*see* Section I.D., above), and the dearth of on point authority, there is no reason to believe that Maryland courts would read 5-203(b) so broadly as to create the common-law right that the Plaintiff Parents seek to pursue in this case.[16]

---

[15]     Section 5-203(c) addresses the "duties of parents of minor parents" and is not relevant to the issues presented in this case. It does note, however, that those responsibilities, too, are borne "jointly and severally." FL § 5-203(c).

[16]     The Plaintiff Parents further note, without elaboration, that the "Maryland Court of Appeals has repeatedly held that medical care of minor children by their parents is included in its broad scope, *see Garay v. Overholtzer*, 332 Md. 339, 366-69, 631 A.2d 429, 442-44 (1993) (collecting cases), and there is no reason to doubt that that includes gender dysphoria." Opp. at 36. Their Opposition also notes that "[t]ransgenderism, like other medical conditions, although it may need to be addressed while the child is in school, is not part of the primary educational mission for which parents have entrusted their children to the public schools." *Id.* at 18. But the Guidelines do not address medical treatment, and the Plaintiffs do not allege that any MCPS personnel have taken any action to make medical decisions for any transgender or gender nonconforming student. Furthermore, the Guidelines specifically note that MCPS "will ensure that all medical information, including that relating to transgender students, is kept confidential *in accordance with applicable state, local, and federal privacy laws.*" Guidelines at 4 (emphasis added).

Accordingly, Count I of the Parents' Complaint is dismissed, and because amendment would be futile, it is dismissed with prejudice.

### B.  FERPA and PPRA

Count IV of the Parents' Complaint alleges that the "MCPS Policy in withholding records from Plaintiff Parents with respect to their children's" gender identity "is in violation of Family Educational Rights and Privacy Act ('FERPA') and Maryland law that implements FERPA." Compl. ¶ 73. Similarly, in Count V, the Parents assert that the Guidelines are "in contravention of" the Protection of Pupil Rights Amendment ("PPRA") "and its implementing regulations and Maryland law by its incorporation through Article 2 of the Declaration of Rights." *Id.* ¶ 84. MCBE argues that both of these claims fail "as a matter of law because Plaintiffs have no private right of action to enforce" FERPA or PPRA under state or federal law. Motion at 22–25. The Parents concede that "FERPA does not provide a federal private right of action" but argue that they have brought their FERPA and PPRA[17] claims "under Maryland law and have sought only declaratory relief related to it." Opp. at 39.

The Parents ground their argument in Article 2 of the Maryland Declaration of Rights, which is Maryland's equivalent of the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. Article 2 provides that "the Laws made . . . under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding." MD. DECL. RTS. art. 2. The Parents reason that Article 2

---

[17]    The Parents do not concede but also do not dispute that there is no private right of action under PPRA. Because they have not asserted a claim under PPRA directly, this issue is not before me. *But see Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616, 623 n. 9 (E.D. Va. 2004) (noting that PPRA does not "create private causes of action. . . .").

"incorporates the federal and state regulations" under FERPA and PPRA, "both of which provide rights expressly to the parents," and that because the Parents "are in the class of those directly affected or protected" by those regulations, they "have standing to complain of its violation by public officials and to seek declaratory relief" under Maryland law. Opp. at 39 (citing Md. Code § 3-409(a)(1) of the Courts and Judicial Proceedings Article; *Pizza di Joey, LLC v. Mayor of Balt.*, 235 A.3d 873, 891 (Md. 2020)).

The Plaintiff Parents do not cite, and I have not found, any Maryland authority that supports their position that Article 2 adopts federal law as state law and creates a private right of action where none exists under the federal statute (or, for that matter, state statute). The closest the Maryland Court of Appeals appears to have come to endorsing that theory is to note that the argument posed "an interesting question," but one that was irrelevant in the case in which it was presented. *See Thomas v. Gladstone*, 874 A.2d 434, 437 (Md. 2005).

MCBE relies in its Motion to Dismiss on Judge Messitte's opinion in *Bauer v. Elrich*, 468 F. Supp. 3d 704 (D. Md. 2020), which has since been affirmed by the Fourth Circuit, 8 F.4th 291 (4th Cir. 2021). The plaintiffs in *Bauer* were taxpayers who took issue with Montgomery County's Emergency Assistance Relief Payment Program ("EARP") because it provided cash assistance to county resident's "including foreign nationals present in the country without documentation, who meet certain income requirements and do not qualify for state or federal pandemic-related aid." 8 F. 4th at 295. The plaintiffs in *Bauer* claimed that the EARP violated a federal statute that generally prohibits undocumented persons from receiving state and local benefits. *See* 8 U.S.C. § 1621(a) ("Section 1621"). Undeterred by the conceded lack of a private right of action in Section 1621, the *Bauer* plaintiffs "styled their claim as arising under the Maryland common law doctrine of taxpayer standing, which permits taxpayers to seek the aid of courts, exercising equity powers, to

enjoin" illegal acts by state officials that are "reasonably likely to result in pecuniary loss to the taxpayer." 8 F.4th at 295. Both this Court and the Fourth Circuit flatly rejected the plaintiffs' argument. *Id.*

The Fourth Circuit in *Bauer* concluded that the "lack of a private right of action in Section 1621 is fatal to the plaintiffs' claim." 8 F.4th at 299. The Court went on to explain that the power to create a private right of action with respect to a federal statute rests solely with Congress:

> Because federal law creates the substantive requirement that the plaintiffs seek to enforce, **we look to federal law to determine whether a private remedy is authorized.** The existence of a private right of action in a federal statute is a pure question of Congressional intent. Given this exclusively legislative role, "courts may not create" a private remedy without evidence of Congress' intent to do so. . . . **The plaintiffs cannot evade this fundamental principle by invoking Maryland's taxpayer standing doctrine to excuse the lack of a Congressionally authorized right of action.** As the Supreme Court recently emphasized, "like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." State courts are not free to ignore the Congressional decision whether to couple a substantive federal requirement with a private right of enforcement; the Supremacy Clause binds state courts to follow Congressional directives embodied in federal statutes. **Were we to agree with the plaintiffs' view, state common law would govern whether and how a federal statute may be enforced, irrespective of Congressional intent. Such a rule not only would run afoul of common sense, but also would violate basic constitutional principles**.

*Id.* (citations omitted) (emphasis added).

The same is true in this case. The Plaintiff Parents concede that no private right of action is established by FERPA, and they do not pursue a claim directly under the PPRA. The Parents' attempt to invoke Article 2 to establish an implied right of action for private citizens under Maryland common law for violations of those statutes is directly at odds with the Fourth Circuit's decision in *Bauer. See also Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 114 (2011).

Accordingly, in light of the dearth of relevant Maryland authority[18] and the Fourth Circuit's decision in *Bauer*, there is simply no basis to find a common law right of action for the private enforcement of FERPA or PPRA under Maryland law. And because the Plaintiff Parents have no private right of action under those statutes, their request for declaratory relief likewise fails. *See Qwest Commc'ns Corp. v. Maryland-Nat'l Cap. Park & Plan. Comm'n*, No. RWT 07CV2199, 2010 WL 1980153, at *11 (D. Md. May 13, 2010) ("The Declaratory Judgment Act cannot be used to circumvent Congress' intent not to provide . . . a private cause of action.).

Accordingly, Counts IV and V of the Complaint must be dismissed, and because amendment would be futile, they are dismissed with prejudice.

### C. COMAR

Finally, in Count II of their Complaint, the Plaintiff Parents assert that the Guidelines violate sections of the Maryland Code of Regulations ("COMAR") that govern parental access to student educational records. Compl. ¶¶ 50–56. MCBE argues that the Guidelines do not violate COMAR, and furthermore that there is no private right of action to enforce the relevant regulations under Maryland law.

My review of the relevant regulations indicates that, read in the light most favorable to the Parents, the Guidelines may advise MCPS personnel to withhold student records in violation of COMAR § 13a.08.02.04. COMAR § 13a.08.02.03(C) broadly defines "student records" as those records that are "[d]irectly related to a student; and [] [m]aintained by an educational agency or institution." And § 13a.08.02.04 provides that "[r]ecords of a student maintained under the

---

[18]     Subject to the limitations of preemption, Maryland may be free to adopt its own version of the remedies that the Parents seek via Article 2. But I have found no indication that Maryland has done so. *See Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 325 (2015) (noting that the Supremacy Clause is "not the source of any federal rights, and certainly does not create a cause of action.").

provisions of this title, **including confidential records**, shall be available to that student's parent or parents . . . or legal guardians in conference with appropriate school personnel." (emphasis added). Withholding the Intake Form from parents requesting access to their child's records might well violate the regulations granting parents access to confidential student records in conference with appropriate school personnel. That said, I agree with MCBE that there is no private right of action for MCBE's alleged violation of the COMAR provisions governing access to student records, and Count II must therefore be dismissed.

The Plaintiffs again assert that there is an "implied right of action" under Maryland law for the alleged regulatory violations. In support of that claim, the Parents cite *Fangman v. Genuine Title, LLC*, 136 A.3d 772, 779 (Md. 2016), in which the Maryland Court of Appeals outlined the applicable three-part test to determine whether a state *statute* contains an implied private right of action under Maryland law. *Id.* (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)).[19] Here, though, the Plaintiff Parents do not ask me to find a right of action implied in a statute, but in a State Board of Education regulation. As MCBE points out, "state agencies do not have authority to create a private right of action." Reply at 29. In contexts in which there *is* a private right of action for the violation of Maryland regulations, that cause of action is, as it must be, created by the Maryland legislature and codified in a statute. *See, e.g.*, Md. Code § 11-703 of the Corporations and Associations Article. The Parents have not identified, and I have not found, any Maryland statute authorizing a private right of action for the violation of the relevant regulations.

---

[19]     In such cases, Maryland courts assess: (1) whether the statutory language confers a beneficial right on a particular class of persons; (2) whether there is any indication of legislative intent to either create or deny such a remedy; and (3) whether it would be consistent with the overall legislative scheme to imply a right of action for the plaintiff. *Id. Fangman* also provides that violations of COMAR may be used to establish the standard of care in a negligence actions. *Id.*

Furthermore, the Plaintiffs are mistaken in their claim that "judicial declaratory relief" is "the only effective relief available to vindicate the parents' rights protected by the regulation." Opp. at 38. COMAR provides that "[e]ach local school system . . . shall give parents or guardians of students . . . annual notice by such means as are reasonably likely to inform them of their right to: . . . File complaints with the United States Department of Education concerning alleged failures by the local school system . . . to comply with the requirements of [FERPA]." COMAR 13A.08.02.10(A)(4). The Parents do not allege that they have pursued that administrative avenue for relief.

Accordingly, Count II of the Complaint must be dismissed, and because amendment would be futile, it is dismissed with prejudice.

## CONCLUSION

For the reasons identified in this Memorandum Opinion, MCBE's Motion to Dismiss is GRANTED. A separate order will be issued contemporaneously herewith.

Dated: August 18, 2022                                    _____/S/_____
                                                        Paul W. Grimm
                                                        United States District Judge